**Reversed and Remanded and Opinion Filed August 14, 2023**



In The

**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-23-00110-CV**

**IN THE INTEREST OF N.J., A CHILD**

**On Appeal from the 305th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. JC-21-00655-X**

**MEMORANDUM OPINION[1]**

Before Justices Reichek, Nowell, and Garcia
Opinion by Justice Nowell

Father[2] appeals the trial court's January 23, 2023 Final Decree of Termination on Verdict of Court.[3] In two issues, Father argues the evidence is legally and factually insufficient to support termination of his parental rights pursuant to section 161.001(b)(1)(E) and insufficient to find termination is in the child's best interest.

---

[1] This case presents an accelerated appeal. An appellate court should dispose of an appeal from a judgment terminating parental rights, in so far as reasonably possible, within 180 days after the notice of appeal is filed. *See* TEX. R. JUD. ADMIN. 6.2(a). In this case, the notice of appeal was filed on February 7, 2023. Although appellant's brief initially was due on March 19, 2023, it was not filed until May 16, 2023. Likewise, while appellee's brief originally was due on June 5, 2023, the brief was not received until July 11, 2023, and not filed until July 13, 2023. Although more than 180 days have passed since the notice of appeal was filed, the Court issues the opinions in this case as soon as reasonably possible.

[2] We use pseudonyms or initials to refer to the child, parents, and other family members involved in this case. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

[3] The trial court also terminated Mother's parental rights. Mother did not appeal.

We reverse the trial court's Decree of Termination as to the termination of Father's parental rights to N.J. and remand this case for further proceedings in accordance with this opinion.

### A.    Standard of Review

The United States Constitution and the Texas Constitution protect parents' rights to raise and nurture their children. *In re J.F.-G.*, 627 S.W.3d 304, 311 (Tex. 2021). For the State to deny these rights to parents, it must establish by clear and convincing evidence: (1) one or more of the statutory grounds for termination enumerated in the family code has been established; and (2) termination is in the child's best interest. TEX. FAM. CODE § 161.001(b); *see also In re J.F.-G.*, 627 S.W.3d at 311. "Clear and convincing evidence" is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007.

Our standard of review on appeal reflects the elevated burden of proof at trial. *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014). Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding, resolving all factual issues in favor of the finding, and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true. *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). For factual sufficiency, we weigh the disputed evidence contrary to the finding and determine whether, in light of the entire record, the evidence that could not reasonably be credited in favor of the

finding is so significant that it would prevent the formation of a firm belief or conviction that the finding is true. *Id*. at 631.

In this case, the trial court found clear and convincing evidence to support termination pursuant to section 161.001(b)(1)(E) of the family code. *See* TEX. FAM. CODE § 161.001(b)(1)(E). A parent who has had his parent–child relationship terminated based on a finding under paragraph (E) may have his parent–child relationship with another child terminated on the basis of the prior termination. *See id.* § 161.001(b)(1)(M) (court may order termination of the parent–child relationship if the court finds by clear and convincing evidence that the parent has "had his or her parent–child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E)"). Thus, when a parent challenges a paragraph (E) finding, due process requires a heightened standard of review of a trial court's finding because of the potential consequences for parental rights to a different child. *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam).

A bench trial was conducted on November 9, 2022, January 5, 2023, and January 9, 2023. After considering the evidence, the trial court terminated Father's parental rights under section 161.001(b)(1)(E) of the family code, and it found termination was in the best interest of N.J. *See* TEX. FAM. CODE § 161.001(b)(1)(E), (b)(2).

**B.     Finding Under Section 161.001(b)(1)(E)**

In his first issue, Father challenges the legal and factual sufficiency of the evidence supporting the trial court's finding under subsection (E).

### 1.     *N.J. Placed with Paternal Grandmother*

N.J. was born in February 2021, and the case began in July 2021 when her biological mother surrendered her to an adoption agency and never attempted to regain custody; the Department considered Mother's actions to be constructive abandonment. Father's paternity was established several months later. Father was not involved in or responsible for N.J. coming into the Department's care. No evidence was presented at trial about the relationship between Father and Mother.

In April 2022, Father, Father's mother, the Department, CASA, and the guardian ad litem entered into a binding mediated settlement agreement appointing Father's mother as N.J.'s Permanent Managing Conservator and Father as the Possessory Conservator. Several weeks after N.J. was placed with Father's mother, T.M., T.M. asked the Department to take the child back. T.M. told the Department that she did not "sign up to daycare [sic] for the next 18 years, and she was tired of raising [Father's] children." To effectuate transferring the child back to the Department's care, a Department caseworker, Priscilla Stewart-Sykes, went to T.M.'s home to obtain an affidavit from T.M. explaining that T.M. would not raise the baby. Father was present when Stewart-Sykes arrived at T.M.'s home.

Father told Stewart-Sykes that no one would be taking his child from him. When T.M. attempted to complete the form affidavit, Father became upset, banged on the kitchen table with his hand, was cursing and "hollering," repeatedly told T.M. the removal was "all her fault," and tore up the affidavit paper. He declared he would not forgive T.M., and "she was no longer his mama." Stewart-Sykes testified the "atmosphere was threatening . . . it was a lot of loud talking at that point with the banging on the table and me hearing things being tossed in the home."

Stewart-Sykes called her supervisor, Anika Jones. Jones could hear Father through the phone, and she described him as being "very loud and disruptive to the point where I asked [Stewart-Sykes] to leave the home because he was yelling at her, and he wouldn't calm down." Jones also advised Stewart-Sykes to call the police. The police arrived, but they would not remove N.J. from the home because Stewart-Sykes did not have the proper paperwork. Instead, the police asked Stewart-Sykes to leave the home, which she did.

At trial, Father testified he asked Stewart-Sykes for the paperwork showing she could remove N.J., and she did not have it; he was not willing to relinquish N.J. to Stewart-Sykes unless she had the proper paperwork.

When Stewart-Sykes arrived at the home, N.J. was in a pack-and-play. At some point during Stewart-Sykes's visit, the child was removed from the pack-and-play. Stewart-Sykes and T.M. asked Father where the child was, but he would not tell them. Before Stewart-Sykes left the home, Father permitted her to see N.J.; N.J.

was not physically injured. The following day, T.M. brought the child to the Department, and the Department took possession of her.

### 2. Father's Services

In May 2022, after T.M. returned N.J. to the Department, Father was ordered to complete services, including parenting classes, a psychological evaluation, a psychiatric evaluation, and an anger management class. Stewart-Sykes testified the psychiatrist prescribed medication, and Father was compliant with his medication as far as she knew. Father testified he has bipolar disorder, takes medication daily, and is medically compliant. The psychological evaluation recommended Father participate in individual counseling, which he was doing when trial began in November 2022. Stewart-Sykes and Father testified he completed his services. However, Jones testified that Father did not because, although Father completed an anger management class in January 2022, he did not complete a second one after being ordered to do so in May 2022; additionally, she testified Father was terminated from his services for noncompliance. As to his services, the trial court judge stated on the record: "While the father may have successfully complied with the Court order for services in this case, there is still, to this day, an ongoing need for successful completion of anger management."

Father's sister, Q.P., is a Department caseworker who was not assigned to this case. On July 25, 2021, Q.P. initiated a virtual Family Group Conference (FGC) to discuss placement of N.J. Stewart-Sykes testified that during the FGC, Father was

–6–

in "anger mode, upset and frustrated" about how the case was proceeding. Father wanted to complete his services and have N.J. placed with him. Jones testified the objectives of the FGC were not met because Father got mad at the beginning of the FGC, insisted the child be placed with him rather than a family member, and accused Jones of lying about his mother. The FGC coordinator ended the meeting.[4]

### 3. Father's Criminal History

Jones testified the Department was concerned about Father's criminal history. Father has been arrested numerous times. He testified that, in 2009, he was arrested for burglary of a habitation; in 2010, he was arrested for driving while intoxicated; in 2013, he was arrested for assault family violence; in 2015, he "had a prostitution charge"; in 2018, he was arrested and charged with aggravated assault and, separately, with aggravated assault with a deadly weapon; in 2022, he was arrested for aggravated assault with a deadly weapon and for possession of marijuana. Father stated he "beat" the aggravated assault with a deadly weapon case and also testified that "[h]alf of the charges you [Department's attorney] brought up got dropped."

During the pendency of this case, Father was arrested for assault family violence against his father for an incident that allegedly occurred on August 2, 2022, he had been in jail the same week he testified at trial in January 2023, and he had

---

[4] Q.P. testified the FGC did not move forward because Father wanted his attorney present, and his attorney was unavailable. She maintained Father remained calm the entire time, he did not yell or raise his voice or show any anger and the FGC did not end because Father was upset and would not cooperate. However, the trial court stated on the record that Q.P. "completely lacks credibility."

one or two pending criminal cases when he testified; however, Father also testified he was not aware of being under indictment at the time of his testimony.[5] Father testified he does not own a firearm and there are no firearms in the home.

No evidence was presented at trial showing Father has any criminal convictions or has served terms of incarceration.

### 4. Father's Family Life

Father attended each visitation with N.J. at the Department's office, and he brought his other children and other family members with him. Stewart-Sykes did not observe any threatening behavior during Father's visits. However, she believed Father drove himself to visitation even though he did not have a driver's license; additionally, she testified, "there was [sic] concerns about whether or not the kids had car seats."

Including N.J., Father has five children. The other children have not been removed nor do they have cases with the Department. Father sees all of his children except N.J. every day; "I try my best to make time, like I don't want to miss no moments, like school I walk to pick them up, I see my kids like daily." Three of the children live with T.M. and one lives with the child's mother. Father has a good relationship with that child's mother.

---

[5] The record is unclear whether any charges were pending in January 2023 when Father testified at trial, including a charge for aggravated assault with a deadly weapon.

Stewart-Sykes testified the Department was not aware of any action or inaction by Father to directly harm N.J. or his other children. Q.P. was not aware of any other active cases involving the children or aware of any complaints about Father parenting his other children. There have never been any allegations that he abused, neglected, or injured his other children; none of the pending criminal charges involve his children. Jones also was not aware of any open investigations involving or court orders restricting Father's ability to see his other children. She was not aware of any incidents with his other children involving violent outbursts. To her knowledge, there was no evidence his other children have been medically neglected.

Father requested that N.J. be placed in his custody or that he be permitted to co-parent with another family member, and he said he is a "great father." He testified that he and his family could take care of all of N.J.'s needs.

### 5. Department's Basis for Termination

Stewart-Sykes believed Father's parental rights should be terminated based on her interaction with him when she went to T.M.'s home. She believed T.M. was afraid of Father, could not control his behavior, and was not capable of protecting N.J. from him. When asked whether, in her opinion, Father had "left the child in a situation in that is -- was unable to care for the child's emotional,[sic] and physical well-being," Stewart-Sykes answered, "Yes. The day I was trying to remover [sic] her." When asked whether the Department "believe[s] that this pattern expressed by [Father] will continue to place [N.J.] in danger if the child is placed either with him

or with relatives," Stewart-Sykes again responded affirmatively, stating none of Father's relatives can control him or "help with his outburst[s]." Stewart-Sykes was asked on cross examination whether she believed Father had allowed N.J. to remain in conditions or surroundings that endangered her, and she replied: "My only - - at one point as when I didn't know where [N.J.] was when I went to the home to remove her, and she was staying away, that's what he said, he sent her away so, at that point I do - - I do believe." She believed Father engaged in conduct or placed N.J. with persons who engaged in conduct that endangered her well-being "[d]ue to me not knowing who she was with, or who she was sent with, yes."

Jones testified Father's actions and T.M.'s response on the day Stewart-Sykes visited T.M.'s home "proved to not keep the child safely [sic] because at a period, we did not know where [N.J.] was and [T.M.] stated, out of her own mouth, she didn't know where [N.J.] was." Jones believed N.J. would be in danger if returned to Father based on Stewart-Sykes's visit to T.M.'s home, her "personal altercations" with Father, and his criminal record. When asked about the personal altercations, Jones testified Father asked that she be removed from the case because "his case hasn't been worked right." Sometimes when he called her, he yelled; "[l]ike whenever something isn't going his way, he would like be aggressive and yell." The Department did not believe Father controlled his anger, including because he was arrested twice for assault during the pendency of the case. Additionally, Jones

thought termination was appropriate because Father had not completed court-ordered services.

### 6.    Analysis

The trial court terminated Father's parental rights based on acts and omissions described in section 161.001(b)(1)(E), which permits a trial court to terminate parental rights if it finds the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.*  Under subsection (E), "endanger" means "to expose to loss or injury; to jeopardize." *In re J.F.-G.*, 627 S.W.3d at 312. The conduct is not required to be directed at the child nor must the child actually suffer any injury. *Id.* An endangerment finding must be based on a voluntary, deliberate and conscious course of conduct by the parent; a single act or omission will not suffice. *In re R.B.*, No. 05-21-00043-CV, 2021 WL 2943927, at *8 (Tex. App.—Dallas July 9, 2021, no pet.) (mem. op.).

The Department and the trial court relied on testimony surrounding Stewart-Sykes's visit to T.M.'s home, Father's expressions of anger, and his criminal history to show his conduct endangered N.J.'s physical or emotional well-being. We conclude that these bases, taken together, are insufficient to show by clear and convincing evidence that Father engaged in conduct as described in subsection (E).

Father was not involved in or responsible for N.J. coming into the Department's care. Rather, N.J. came into the Department's care when Mother

–11–

constructively abandoned the infant. No evidence shows Father participated in Mother's decision to place N.J. in the Department's care, nor does any evidence show what relationship, if any, Father had with Mother at the time Mother abandoned N.J.

Father initially worked with the Department and entered into a binding mediated settlement agreement appointing his mother as Permanent Managing Conservator and himself the Possessory Conservator. Shortly thereafter, T.M. asked the Department to take possession of N.J. again because she was unwilling to provide daycare for N.J. or be responsible for raising the then-infant for 18 years.

Father became angry when he learned his mother was returning his child to the Department shortly after the MSA was put into place, and the Department was attempting to take his child away without any documentation showing the Department had a legal right to do so. While the Department expressed concerns that N.J. was removed from her pack-and-play during Stewart-Sykes's visit to T.M.'s home, there is no evidence about who took N.J. out of the pack-and-play, where she was taken, or how long she was gone; however, the evidence shows N.J. was unharmed when Stewart-Sykes saw her before leaving the home. Father also expressed anger about the duration of the pending case and his inability to have possession of his child.

Father's criminal history includes a myriad of arrests, but the record does not show he has been convicted of any crime. Father testified that half of the arrests or

charges that the Department raised during its examination of him had been dropped, and no contradictory evidence was presented. No evidence was presented at trial showing Father has any criminal convictions or has served one or more terms of incarceration. The lack of evidence regarding convictions, if any, distinguishes this case from *In re J.F.-G.* and its progeny, in which parents' criminal histories that included convictions, some coupled with terms of incarceration, were considered in the context of subsection (E).

Father attended every visitation with N.J, and Stewart-Sykes did not observe any threatening behavior during Father's visits. He sees his other children every day, and there have been no allegations Father mistreated his other children. Father has bipolar disorder and is medication compliant. Father completed most of his services, except that he completed an anger management class a few months before the trial court ordered another one.

The dissent analogizes the facts before us to *In re L.E.H.*, No. 05-18-00903-CV, 2018 WL 6839565 (Tex. App.—Dallas Dec. 31, 2018, no pet.) (mem. op.). We believe the cases are factually distinguishable. In *L.E.H.*, as in the case before us, the record did not contain "complete information" about Father's criminal history. *See id.* However, the record in *L.E.H.* showed the father had been in and out of jail or prison four times: he was incarcerated for five years, was in jail for "the second half of 2016," returned to prison for drug possession, and was released from jail days before trial in the case. *See id.* The case was referred to the Department while the

father was incarcerated and the children were in the mother's care. *See id.* The father told the Department's caseworker that he and the mother had "a romantic relationship that became violent," which was why he was in jail on one occasion. *See id.* at *2. The father knew the mother used drugs, and he used marijuana with her. *See id.*

At least ten hearings were held in the case, and the father attended only one. *See id.* He visited the children once while they were in the Department's care. *See id.* On that occasion, the father told the caseworker he wanted to take actions necessary to remove the children from foster care. *See id.* The caseworker instructed him to take a drug test and told him where to have the testing done; the father did not do so. The caseworker also made an appointment with the father to discuss a service plan, but the father did not show up. *See id.* During the one visit the father attended with the children, he gave his eleven-year-old son a BB gun, which looked like a real gun; the child took the gun to school, and the child's foster father had to intervene to prevent the child being removed from school for the incident. *See id.* The caseworker also testified the father had constructively abandoned the children. *See id.*

In *L.E.H.*, the father's parental rights to two sons were terminated pursuant to subsection (E) and other provisions of the family code. *See id.* at *1, *4. On appeal, the father argued the evidence was insufficient to terminate his parental rights under 161.001(b)(1)(E). *See id.* at *5. This Court concluded the father engaged in a pattern

of crime and imprisonment demonstrating a deliberate course of conduct that endangered his children's emotional and physical well-being. *See id.* Analyzing the facts of the case and concluding the evidence was legally and factually sufficient, this Court stated:

> Regardless of the reasons for his incarceration, Father's continued criminality contributed to the neglectful and unstable environment in which the boys had lived. Father admitted he was aware of Mother's drug use. Yet he continued to engage in crime while his children were left in the care of a Mother using a host of illegal drugs. In addition, there was evidence of Father's use of marijuana and possession of PCP and violence against Mother.

*See id.*

Unlike in *L.E.H.*, in the case before us, there is no evidence Father has served any terms of incarceration; the evidence only shows Father has been arrested several times. There also is no evidence Father has an ongoing relationship with Mother, was violent toward Mother, knew about N.J.'s existence before this case began, or left N.J. with Mother in unsafe surroundings.

Unlike the father in *L.E.H.*, Father attended all visitations with N.J. and the Department did not observe any threatening behavior during Father's visits. Father repeatedly expressed his interest in being N.J.'s father, and he completed all required services except taking a second anger management class – again, unlike the father in *L.E.H.* who failed to discuss the required services or to appear for a drug test after being told he must do so. While the Department believed Mother constructively abandoned N.J., there is no evidence it believed Father did so as well.

### 7. Conclusion

Having reviewed the record, and being particularly mindful that due process requires a heightened standard of review of a trial court's finding under subsection (E) because of the potential consequences for parental rights to other children, we conclude the evidence is legally insufficient to deny Father his constitutional rights to raise his child. *See In re N.G.*, 577 S.W.3d at 235; *In re J.F.-G.*, 627 S.W.3d at 311. The record does not contain clear and convincing evidence that Father exposed N.J. to loss or injury or jeopardized her physical or emotional well-being. *See In re J.F.-G.*, 627 S.W.3d at 312; *see also In re N.G.*, 577 S.W.3d at 235. Rather, the record shows Father became angry when the Department sought to remove his child without any paperwork entitling it to do so and he was angry because obtaining legal possession of his child took a long time; we cannot conclude these are attributes of a parent endangering a child. We sustain Father's first issue.

We do not address whether N.J.'s best interest is to be transferred immediately to Father's custody and control. "It is possible that her best interest is to remain for some time with [the Department] while Father's status is evaluated. But the Department is required to meet its burden of proof, and the evidence introduced at trial fails, at this juncture, to overcome the presumption in favor of preserving the parent–child relationship." *In re M.K.*, No. 05-18-01297-CV, 2019 WL 2283886, at *6 (Tex. App.—Dallas May 29, 2019, no pet.) (mem. op.).

## C.    Conclusion

In light of our resolution of Father's first issue, we need not address his second issue in which he argues the evidence is insufficient to show termination of Father's parental rights is in N.J.'s best interest. *See* TEX. R. APP. P. 47.1.

Having concluded that the trial court's termination of Father's parental rights was not supported by sufficient evidence, we reverse the trial court's termination of Father's parental rights to N.J. We remand this case for further proceedings in accordance with this opinion.

/Erin A. Nowell//

230110f.p05

ERIN A. NOWELL
JUSTICE

Garcia, J., dissenting



## Court of Appeals
## Fifth District of Texas at Dallas
### JUDGMENT

IN THE INTEREST OF N.J., A CHILD

No. 05-23-00110-CV

On Appeal from the 305th Judicial District Court, Dallas County, Texas
Trial Court Cause No. JC-21-00655-X.
Opinion delivered by Justice Nowell. Justices Reichek and Garcia participating.

In accordance with this Court's opinion of this date, the trial court's January 23, 2023 Final Decree of Termination on Verdict of Court is **REVERSED** as to the termination of Father's parental rights to his child, N.J., and this cause is **REMANDED** to the trial court for further proceedings in accordance with this opinion.

Judgment entered this 14th day of August, 2023.